Robert J. Tuerck (State Bar No. 255741)
JACKSON & TUERCK
P.O. Box 148
429 W. Main Street, Suite C
Quincy, CA 95971
Tel: (530) 283-0406
E-mail: bob@jacksontuerck.com

Andrew L. Packard (State Bar No. 168690)
LAW OFFICES OF ANDREW L. PACKARD
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com

Attorneys for Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation, <br><br>         Plaintiff, <br><br>    vs. <br><br> GUNTERT SALES & ZIMMERMAN, *et.al.* <br><br>         Defendants | Case No. 2:13−CV−02196−MCE−CKD <br><br> **CONSENT AGREEMENT** <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

**WHEREAS**, Plaintiff California Sportfishing Protection Alliance (hereinafter "CSPA" or "Plaintiff") is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California's waters;

**WHEREAS**, Defendants Guntert & Zimmerman Const. Div., Inc. and Guntert Sales Div., Inc. (named in the lawsuit as Guntert Sales & Zimmerman, Guntert Steel), and Ronald M. Guntert (collectively hereinafter "Guntert" or "Defendants") own an approximately twenty-two

- 1 -

(22) acre construction machinery equipment and metal services facility located at 222 E. 4th Street, in Ripon, California ("the Facility"), which is used for processing, fabrication, and storage of various sheet metals and metal products, along with other industrial activity, including the use, storage, maintenance, fueling, and washing of trucks, concrete slip-form paving equipment, trucks, and other heavy machinery;

**WHEREAS,** CSPA and Defendants are collectively referred to herein as the "Parties;"

**WHEREAS**, the Facility collects and discharges storm water into the City of Ripon's storm drain system, which discharges to the Stanislaus River, which is a tributary to the Sacramento River and the Sacramento-San Joaquin Delta. (a map of the Facility is attached hereto as Exhibit A, and is incorporated herein by reference);

**WHEREAS**, storm water discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 97-03-DWQ), issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342 (hereinafter "General Permit");

**WHEREAS**, on or about August 20, 2013, Plaintiff provided notice of Defendants' alleged violations of the Act, and of its intention to file suit against Defendants, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"); the U.S. Attorney General; and to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A) (true and correct copies of CSPA's notice letter are attached as Exhibit B and incorporated herein by reference);

**WHEREAS**, Defendants deny the occurrence of the violations alleged in the Notices and maintain that they have complied at all times with the provisions of the General Permit and the Clean Water Act;

**WHEREAS**, CSPA filed a complaint ("Complaint") against Defendants in the United States District Court, Eastern District of California, on October 21, 2013 (the "Action");

**WHEREAS**, for purposes of this Consent Agreement, the Parties stipulate that venue is proper in this Court, and that Defendants do not contest the exercise of jurisdiction by this Court to enter this Consent Agreement;

**WHEREAS**, this Consent Agreement shall be submitted to the United States Department of Justice for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c), and shall thereafter be submitted for approval by the Court, the date of which approval shall be referred to herein as the "Court Approval Date;"

**WHEREAS,** at the time the Consent Agreement is submitted for approval to the United States District Court, CSPA shall request a dismissal, with prejudice, of all claims against the Defendants in the Complaint and the Parties shall stipulate and request that the Court retain jurisdiction for the enforcement of this Consent Agreement as provided herein;

**AND WHEREAS**, the Parties agree that it is in their mutual interest to resolve this matter without further litigation.

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE PARTIES, AND ORDERED AND DECREED BY THE COURT, AS FOLLOWS:**

**I.     COMMITMENTS OF GUNTERT**

**1.     Compliance with General Permit and Clean Water Act.** Throughout the Term of this Consent Agreement (defined below at ¶ 20), Guntert shall commence all measures needed to operate the Facility in full compliance with applicable requirements of the General Permit and the Clean Water Act, subject to any defenses available under the law.

**2.     Guntert's Implementation of Specific Storm Water Best Management Practices.** Subject to Guntert's continuing investigation and analysis which may result in revised Best Management Practices ("BMPs"), Guntert shall implement the following structural and non-structural BMPs to improve the storm water pollution prevention measures at the Facility:

General Facility

   a.  Guntert shall conduct a topographic survey of the Facility to identify all points of storm water discharge and determine the appropriate locations for the drainage inlets to the future infiltration basin and canals at the Facility within thirty (30) days of the Court Approval Date;

**b.** Within ninety (90) days of the Court Approval Date, Guntert will design an infiltration basin and canals with the capacity to contain the necessary runoff to prevent discharge from the unpaved areas of the: (1) West Yard, (2) Middle Yard; (3) South Yard; and (4) Fallow Land;

**c.** Guntert will conduct a pilot infiltration test in the proposed area of the infiltration basin within sixty (60) days of the Court Approval Date;

**d.** Guntert agrees to submit plans and applications to obtain necessary approvals to construct the drainage features to the City of Ripon and other state or local land use authorities within ninety (90) days of the Court Approval Date;

**e.** During the 2014 Dry Season (June 1 through September 30) and after agency approval, but not later than September 30, 2014, Guntert will construct the infiltration basin and canals in the general area designated on the attached Facility Map (see, Exhibit A);

**f.** Guntert shall annually vacuum and cover all drop inlets at the Facility during the Dry Season (June 1 through September 30) to reduce the amount of sediments entering the Facility's discharge point;

**g.** Within thirty (30) days of the Court Approval Date, Guntert shall conduct regular sweeping (excluding rainy weather days and/or weeks) of the paved areas of the Facility using a magnetic and/or vacuum sweeper.  Sweeping shall occur at least once per week during the Wet Season (October 1 through May 30) and at least once per month during the Dry Season (June 1 through September 30);

**h.** Guntert shall keep detailed records of the sweeping activities described in Paragraph 2(g).  The records shall include, at minimum, sweeping dates and times, the name of the operator, weather conditions, and any other notable conditions that are relevant to implementation of the sweeping requirements (e.g., conditions that prevent sweeping, etc.). A sample form of the sweeping log shall be included in the Facility's SWPPP.  Guntert shall provide CSPA with copies of the sweeping records/logs on or before July 1st of each year covered by this Consent Agreement. The documents and reports shall be provided to CSPA pursuant to the Notice provisions herein (at ¶ 27);

West Yard

**i.** Until the infiltration basin and canals are constructed, existing catch basins in the middle of the West Yard will be maintained using the existing permeable geo-textile beneath a thick layer of course gravel with straw wattle that encircle each of the catch basins and silt socks within each basin during the Wet Season (October 1 through May 30);

**j.** After construction of the Facility's infiltration basin and canals, Guntert will discontinue use and seal off the West Yard discharge point into the City's Storm Water System;

**k.** After construction of the Facility's infiltration basin, a canal will be used to direct the storm water from the West Yard into the canal, which will carry the storm water from the West Yard through the Middle Yard to the infiltration basin in the South Yard;

**l.** Guntert will maintain a silt sock within the storm water collection trench located on the west side of the manufacturing building to reduce the discharge of total dissolved solids;

**m.** After construction of the Facility's infiltration basin and canals, Guntert will redirect the roof downspouts from the manufacturing building from the North Yard to the proposed canal located along the south property line in the West Yard;

**n.** Guntert shall add vegetation and check dams to the canals within thirty (30) days of the completion of the infiltration basin and canals, and shall continue to maintain the canals to prevent erosion and sediment build-up;

Middle Yard

**o.** Until the infiltration basin and canals are constructed, the existing catch basin in the Middle Yard will be maintained using the existing permeable geo-textile beneath a thick layer of course gravel with straw wattle that encircle the catch basin and a silt sock within the catch basin during the Wet Season (October 1 through May 30);

**p.** After the construction of the infiltration basin and canals, Guntert will discontinue use and seal off the Middle Yard discharge point into the City's Storm Water System;

**q.** Guntert shall add vegetation and check dams to the canal within thirty (30) days of the completion of the infiltration basin and shall continue to maintain the canal to prevent erosion and siltation;

South Yard

**r.** Until the infiltration basin and canals are constructed, the existing catch basin in the South Yard will be maintained using the existing permeable geo-textile beneath a thick layer of course gravel with straw wattle that encircle the catch basin and a silt sock within the catch basin during the Wet Season (October 1 through May 30);

**s.** After the construction of the infiltration basin and canals, Guntert will discontinue use and seal off the South Yard discharge point into the City's Storm Water System;

**t.** Runoff to the South Yard from the City of Ripon's adjacent property will be re-directed by using a series of small berms and ditches to the City of Ripon's Pump Station collection point;

Fallow Land

**u.** During the 2014 Dry Season, no later than September 30, 2014, and as part of the construction of the infiltration basin and canals, Guntert will protect the slope area along East Fourth Street by using permeable geo-textile beneath a thick layer of course gravele, east of the main facilities, in order to minimize runoff to the North Yard catch basin located on Fourth Street and maximize the infiltration on the property. The fallow land will be re-graded. The grading will direct storm water, by sheet flow, to a canal along the south property line, which will direct the storm water to the infiltration basin;

**v.** Defendants shall add vegetation and check dams to the canal within thirty (30) days of the completion of the Main Basin and shall continue to maintain the canal to prevent erosion and siltation;

North Yard

**w.** Within thirty (30) days of the Court Approval Date, Guntert shall installed a large capacity silt sock in the North Yard catch basin, located in Fourth Street;

**x.** At least once every week during each Wet Season (October 1 through May 30) covered by the Term of this Agreement, Guntert will sweep the east manufacturing area and the parking lot areas which drain to the North Yard catch basin on Fourth Street; and

**y.** Guntert shall keep detailed records of the sweeping activities described in Paragraph 2(g). The records shall include, at minimum, sweeping dates and times, the name of the operator, weather conditions, and any other notable conditions that are relevant to implementation of the sweeping requirements (e.g., conditions that prevent sweeping, etc.). A sample form of the sweeping log shall be included in the Facility's SWPPP. Guntert shall provide CSPA with copies of the sweeping records/logs on or before July 1st of each year covered by this Amended Consent Agreement. The documents and reports shall be provided to CSPA pursuant to the Notice provisions herein (at ¶ 27).

If, as a result of the ongoing investigation and analysis of storm water conditions at the Facility, Guntert determines that any of the aforementioned BMPs are impractical or impossible to implement, the parties shall meet-and-confer to discuss possible alterations to the BMPs and amendment to this Agreement. Guntert shall not unilaterally abandon or modify any of the BMPs described above without prior consultation with CSPA. Guntert's failure to meet-and-

- 6 -

confer with CSPA prior to altering the BMP and schedule described herein shall constitute a breach of this Agreement.

Unless otherwise noted above, each of the BMPs described in 2.a. – 2.y. shall be completed on or before September 30, 2014.  If timely implementation of any of the BMPs set forth above becomes impossible, despite the timely good faith efforts of the Defendants, Defendants shall notify CSPA in writing within seven (7) calendar days of the date that the failure becomes apparent, and shall describe the reason for the non-performance. The Parties agree to meet and confer in good faith concerning the nonperformance and, where the Parties concur that the non-performance was or is impossible, despite Defendants' timely good faith efforts, new performance deadlines shall be established. In the event that the Parties cannot timely agree upon the terms of such an extension, either of the Parties shall have the right to invoke the dispute resolution procedure described herein.  In the event Defendants are unable to complete construction of any the BMPs described in Sections 2.a. – 2.y. by September 30, 2014, the Term of this Consent Agreement shall be extended until September 30, 2016.

**3.**     **SWPPP Amendments/Additional BMPs.** Within thirty (30) days of the Court Approval Date, Guntert shall formally amend the SWPPP for the Facility to incorporate all of the relevant requirements of this Consent Agreement, as well as the revised Facility map attached hereto as Exhibit A. A copy of the SWPPP shall be provided to CSPA pursuant to the Notice provisions herein (at ¶ 27).

**4.**     **Sampling Frequency.** Guntert shall collect and analyze samples from four (4) Qualifying Storm Events ("QSE"), as set forth in the General Permit[1] for sampling purposes, in each of the Wet Seasons[1] occurring during the Term of this Consent Agreement.  Guntert shall collect and analyze storm water samples from two (2) QSEs within the first half of each Wet Season (October 1st to December 31st), including the first QSE of the Wet Season, and two (2)

---

[1] "Qualifying Storm Events" under the General Permit are those events in which (i) the samples taken are preceded by at least three (3) working days during which no storm water discharges from the Facility have occurred; (ii) the samples are collected within the first hour that flow is observed when Guntert's designated safety officer is present at the Discharge Point being sampled; and (iii) the samples are collected during daylight and scheduled facility operating hours.
[2] The "Wet Season" includes October 1st – May 30th of each calendar year.

QSEs within the second half of each Wet Season (January 1st to May 30th).  The QSE sample results shall be compared with the values set forth in Exhibit C, attached hereto, and incorporated herein by reference. If the results of any QSE samples exceed the parameter values set forth in Exhibit C, Guntert shall comply with the "Action Memorandum" requirements set forth below (at ¶ 6).

5.      **Sampling Parameters.** QSE samples shall be analyzed for each of the constituents listed in Exhibit C by a laboratory accredited by the State of California.  QSE samples collected from the Facility shall be delivered to the laboratory as soon as possible to ensure that sample "hold time" is not exceeded.  Analytical methods used by the laboratory shall be adequate to detect the individual constituents at or below the values specified on Exhibit C.  Sampling results shall be provided to CSPA within seven (7) days of Guntert's receipt of the laboratory report from each QSE sampling event pursuant to the Notice provisions herein (at ¶ 27).

6.      **"Action Memorandum" Trigger; CSPA Review of "Action Memorandum"; Meet-and-Confer.** If any QSE sample taken during the Wet Seasons occurring during the Term of this Agreement exceeds the evaluation levels set forth in Exhibit C, Guntert shall prepare a detailed, written statement describing the excess, the possible cause(s) and/or source of the excess, additional measures  that will be taken to address and eliminate the problem and future exceedances, and a time line for implementing said additional measures ("Action Memorandum"). The Action Memorandum shall be provided to CSPA no later than thirty (30) days after Guntert's receipt of the sample results at issue. Recognizing that a SWPPP is an ongoing iterative process meant to encourage innovative BMPs, the additional measures described in the Action Memorandum may include, but are not limited to, taking confirmation samples, increasing the storage and/or treatment capacity of the infiltration basin and canals, further material improvements to the storm water collection and discharge system, changing the frequency of sweeping activities, changing the type and extent of industrial activities and/or Best Management Practices at the Facility. Such additional measures, to the extent feasible,

shall be implemented no later than seventy-five (75) days after the due date of the Action Memorandum, except where: (1) structural changes require longer than seventy-five (75)calendar days to complete; (2) weather-related conditions render timely implementation infeasible; or (3) the Parties otherwise agree in writing. If the additional measures cannot be implemented within seventy-five (75) days of the due date of the Action Memorandum, Guntert will include an explanation for why additional time is needed in the Action Memorandum. Within thirty (30) days of implementation of any such additional measures, the Facility SWPPP shall be amended to include all additional BMP measures designated in the Action Memorandum. CSPA may review and comment on an Action Memorandum and suggest any additional pollution prevention measures it believes are appropriate.  CSPA will provide Guntert with any such comments and suggestions within sixty (60) days of its receipt of the Action Memorandum; however, CSPA's failure to do so shall not be deemed to constitute agreement with the proposals set forth in the Action Memorandum. Upon request by CSPA, Guntert agrees to meet and confer in good faith (at the Facility, if requested by CSPA) regarding the contents and sufficiency of the Action Memorandum.

7.     **Inspections During the Term of this Agreement.** In addition to any site inspections conducted as part of the meet-and-confer process concerning an Action Memorandum as set forth above, Guntert shall permit representatives of CSPA to perform up to three (3) physical inspections of the Facility during normal daylight business hours during the Term of this Consent Agreement. These inspections shall be performed by CSPA's counsel and consultants and may include stormwater water quality sampling, photographing, and/or videotaping and CSPA shall provide Guntert with a copy of all sampling reports, photographs and/or video. CSPA shall not inspect the interior of the buildings located on the Facility without the express written permission of Guntert or its legal representative.  CSPA shall provide Guntert with at least seventy-two (72) hours prior written Notice via email transmission (as set forth in ¶27) of such physical

inspection, except that Guntert shall have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with business operations of Guntert or its attorney, or threaten the safety of individuals. In such case, Guntert shall specify at least three (3) dates within the two (2) weeks thereafter upon which a physical inspection by CSPA may proceed. Guntert shall not make any material alterations to Facility conditions during the period between receiving CSPA's initial advance notice and the start of CSPA's inspection that Guntert would not otherwise have made but for receiving notice of CSPA's request to conduct a physical inspection of the Facility, excepting any actions taken in compliance with any applicable laws or regulations.  Guntert shall provide CSPA with written documentation of any alterations to Facility conditions during the period between receiving CSPA's notice of inspection and the start of CSPA's inspection.  Nothing herein shall be construed to prevent Guntert from continuing to implement any BMPs identified in the SWPPP during the period prior to an inspection by CSPA or at any time.

**8.**     **Guntert's Communications with Regional and State Boards.** During the Term of this Consent Agreement, Guntert shall provide CSPA with copies of all documents submitted to the Regional Board or the State Board concerning storm water discharges from the Facility, including, but not limited to, all documents and reports submitted to the Regional Board and/or State Board as required by the General Permit. Such documents and reports shall be provided to CSPA pursuant to the Notice provisions herein (at ¶ 27) and contemporaneously with Guntert's submission to such agencies.

**9.**     **Future SWPPP Amendments.** Guntert shall provide CSPA with a copy of any amendments to the Facility SWPPP made during the Term of the Consent Agreement within fourteen (14) days of such amendment.

## II.     MITIGATION, COMPLIANCE MONITORING AND FEES AND COSTS

**10.**     **Mitigation.** As mitigation of the Clean Water Act violations alleged in CSPA Complaint, Guntert agrees to pay the sum of $45,000.00 to the Rose Foundation for Communities and the Environment (the "Rose Foundation") for projects to improve water quality in local watersheds

of San Joaquin County, the Stanislaus River, the San Joaquin River, and/or the Sacramento-San Joaquin Delta.  The mitigation payment shall be made in three installments.  The first installment payment of $15,000 shall be made within seven (7) days after the Court Approval Date.  The second installment payment of $15,000 shall be made on or before January 1, 2015.  The third installment payment of $15,000 shall be made on or before January 1, 2016. The Rose Foundation shall endeavor to apply the funds to projects within 50 miles of the Facility.   If the Rose Foundation cannot identify a suitable project within 50 miles of the Facility, then the funds shall be used on any applicable project in the watersheds described above.     None of the funds paid to the Rose Foundation shall be used to pay attorneys' fees in litigation against any of the Defendants to this action.  Payment shall be provided directly to the Rose Foundation as follows: Rose Foundation, 6008 College Avenue, Oakland, CA 94618, Attn: Tim Little. The Rose Foundation shall provide notice to the Parties within thirty (30) days of when the funds are dispersed by the Rose Foundation, setting forth the recipient and purpose of the funds.

**11.     Compliance Monitoring Funding.** To defray CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs associated with monitoring Guntert's compliance with this Consent Agreement, Guntert agrees to contribute $10,000 to a compliance monitoring fund maintained by CSPA. Compliance monitoring activities may include, but shall not be limited to, site inspections, review of water quality sampling reports, review of annual reports, discussions with representatives of Guntert concerning the Action Memoranda referenced above, and potential changes to compliance requirements herein, preparation for and participation in meet-and-confer sessions, water quality sampling and analysis, and compliance-related activities. The $10,000 shall be paid to the Jackson & Tuerck Attorney-Client Trust Account, and sent to JACKSON & TUERCK at P.O. Box 148, Quincy, CA 95971, in two (2) annual installments. The first installment shall be paid on or before June 1, 2015; the second installment shall be paid on or before June 1, 2016.  Guntert further agrees to reimburse CSPA for actual, reasonable and necessary fees and costs in excess of the aforementioned $10,000.00 up to a maximum of

$5,000.00, if said fees and costs are incurred as a result of investigations, inspections, or any meet and confer that becomes necessary because any or all of the following occur:

    **a.**    Guntert fails to implement any of the BMPs, or comply with any of the conditions set forth in Section 2 of this Agreement;

    **b.**    Guntert fails to comply with the Action Memorandum requirements set forth in Section 6 of this Agreement;

Such fees and costs shall include reasonable investigative, expert, consultant and attorneys' fees and costs, incurred as a result of the investigation, inspection and meet and confer process.

**12.**    **Fees and Costs.** Guntert agrees to reimburse CSPA in the amount of $29,000 in two installments, consisting of $14,500 per installment to defray CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs, incurred as a result of investigating the activities at the Facility, bringing the Action and negotiating a resolution in the public interest. The first installment is payable within seven (7) days of the Court Approval Date and the second installment is payable six (6) months thereafter. Such payments shall be made to the Jackson & Tuerck Attorney-Client Trust Account, and sent to JACKSON & TUERCK at P.O. Box 148, Quincy, CA 95971.

**III.**    **DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT**

**13.**    **Jurisdiction of the Court.** Upon the Court Approval Date, the Parties shall file with the Court a Stipulation and Order that shall provide that: (1) the Complaint and all claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2), and (2) the Court shall retain and have jurisdiction over the Parties with respect to disputes arising under this Consent Agreement. Nothing in this Consent Agreement shall be construed as a waiver of any Party's right to appeal from an order that arises from an action to enforce the terms of this Consent Agreement.

**14.**    **Meet and Confer.** With the exception of the timelines set forth above for addressing exceedances of values specified on Exhibit C and Action Memoranda, if a dispute under this Consent Agreement arises, or either Party believes that a breach of this Consent Agreement has

occurred, the Parties shall meet and confer within seven (7) days of receiving written notification from the other Party of a request for a meeting to determine whether a violation has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute. If the Parties fail to meet and confer, or the meet-and-confer does not resolve the issue, after at least seven (7) days have passed after the meet-and-confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under the law, including filing a motion with the District Court of California, Northern District, which shall retain jurisdiction over the Action for the limited purposes of enforcement of the terms of this Consent Agreement.  The Parties shall be entitled to seek: (1) injunctive relief as needed to remedy the alleged breach/breaches of the Consent Agreement, (2) additional mitigation payments to the Rose Foundation, and/or (3) reimbursement of fees and costs incurred in the litigation of any such motion, and such fees and costs may be awarded, pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, 33 U.S.C. §1365(d), and applicable case law interpreting such provision.

15.    **Right to Cure.** Except in case of an emergency but subject to the regulatory authority of any applicable governmental authority, any breach of or default under this Consent Agreement capable of being cured shall be deemed cured if, within five (5) days of first receiving notice of the alleged breach or default, or within such other period approved in writing by the Party making such allegation, which approval shall not be unreasonably withheld, the party allegedly in breach or default has completed such cure or, if the breach or default can be cured but is not capable of being cured within such five (5) day period, has commenced and is diligently pursuing to completion such cure.

IV.    **MISCELLANEOUS PROVISIONS**

16.    **Purpose.**   The Parties enter into this Consent Agreement for the purpose of avoiding prolonged and costly litigation. Nothing in this Consent Agreement shall be construed as, and Defendants expressly do not intend to imply, an admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Agreement constitute or be construed as an admission by Defendants of any fact, finding, conclusion, issue of law, or violation of law.

However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Consent Agreement.

**17.     Parties.** This Consent Agreement and its attachments are made for the sole benefit of the Parties named herein, and no other person or entity shall have any rights or remedies under or by reason of this Consent Agreement, unless otherwise expressly provided for therein.

**18.     CSPA's Waiver and Release.** Upon the Court Approval Date and entry of this Consent Agreement, CSPA, on its own behalf and on behalf of its members, subsidiaries, successors, assigns, directors, officers, agents, attorneys, representatives, and employees, releases Defendants and their officers, directors, employees, shareholders, parents, subsidiaries, and affiliates, and each of their predecessors, successors and assigns, and each of their agents, attorneys, consultants, and other representatives (each a "Released Defendant Party") from, and waives all claims which arise from or pertain to the Action, including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed in this Action, for the alleged failure of Defendants to comply with the Clean Water Act at the Facility, up to the Effective Date of this Consent Agreement.

During the term of the Consent Agreement, CSPA agrees that neither CSPA, its officers, executive staff, or members of its governing board nor any organization under the control of CSPA, its officers, executive staff, or members of its governing board, will file any new lawsuit against the Defendants seeking relief related to storm water discharged from the Facility. CSPA further agrees that, during the term of the Consent Agreement, CSPA will not support other lawsuits, by providing financial assistance, personnel time or other affirmative actions, against the Defendants arising from its operation of the Facility that may be proposed by other groups or individuals who would rely upon the citizen suit provision of the Clean Water Act or state law claims to challenge the City's management of storm water at the Facility.  Nothing in this section

shall be construed as limiting CSPA's right to enforce the terms and conditions of this Agreement or its right to appeal from an order that arises from an action to enforce the terms of this Consent Agreement.

19.     **Defendants' Waiver and Release.** Defendants, on their own behalf and on behalf of those Released Defendant Parties under their control, release CSPA (and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representative) from, and waive all claims which arise from or pertain to the Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to the Action up to the Effective Date of this Consent Agreement.

20.     **Term.**  It is the intent of the Parties that the Term of this Agreement cover two (2) complete Wet Season following the implementation of the BMPs set forth in Section 2 above. Therefore, the Term of this Consent Agreement shall run from the Court Approval date until September 30, 2016, unless implementation of any the BMPs indentified in Section 2 are not completed prior to September 30, 2014, in which case the Term of this Agreement shall be extended to September 30, 2017.

21.     **Execution.** The undersigned are authorized to execute this Consent Agreement on behalf of their respective parties and have read, understood and agreed to be bound by all of the terms and conditions of this Consent Agreement.

22.     **Formalities of Execution.** The Consent Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document. An executed copy of this Consent Agreement shall be valid as an original. Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

23.     **Invalidity and Severability.** In the event that any of the provisions of this Consent Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

**24.    Disapproval by Court.**  If for any reason the Court should decline to approve this Consent Agreement in the form presented, the Parties shall use reasonable efforts to work together to modify the Consent Agreement within thirty (30) days so that it is acceptable to the Court. If the Parties are unable to modify this Consent Agreement in a mutually acceptable manner, this Consent Agreement shall become null and void.  Should this proposed Consent Agreement fail to be entered for any reason, this proposed Consent Agreement, and any statement or other provision contained in this proposed Consent Agreement shall have no legal effect and shall not be used for any purpose in any subsequent proceeding in this or any other litigation.

**25.    Construction/Applicable Law.**  The language in all parts of this Consent Agreement, unless otherwise stated, shall be construed according to its plain and ordinary meaning. This Consent Agreement shall be construed pursuant to California law, without regarding to conflict of law principles.

**26.    Entirety of the Agreement.**  This Consent Agreement and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Consent Agreement, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings, and communications of the Parties, whether oral or written, respecting the matters covered by this Consent Agreement. All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Agreement are contained herein.

**27.    Notice.** Unless otherwise stipulated to by the receiving party, any notices or documents required or provided for by this Consent Agreement or related thereto that are to be provided to CSPA pursuant to this Consent Agreement shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

1   Bill Jennings, Executive Director
2   California Sportfishing Protection Alliance
    3536 Rainier Avenue
3   Stockton, CA 95204
    E-mail: DeltaKeep@aol.com
4
5   With copies sent to:

6       Robert J. Tuerck, Esq.
        Jackson & Tuerck
7       P.O. Box 148
        Quincy, CA 95971
8       Tel: (530) 283-0406
        Fax: (530) 283-0416
9       E-mail: bob@JacksonTuerck.com

10  And to:
11
12      Andrew L. Packard
        Law Offices of Andrew L. Packard
13      100 Petaluma Boulevard North, Suite 301
        Petaluma, CA 94952
14      Tel: (707) 763-7227
        E-mail: andrew@packardlawoffices.com
15
16          Any notices or documents required or provided for by this Consent Agreement or related
    thereto that are to be provided to Defendants pursuant to this Consent Agreement shall be sent by
17
    U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by
18
    electronic mail transmission to the email addresses listed below:
19
20      Ronald M. Guntert, Jr., CEO
        Guntert & Zimmerman Const. Div. Inc.
21      Guntert Sales Div. Inc.
        222 East Fourth Street
22      Ripon, California 95366
        Tel: (209) 599-0066
23      Fax: (209) 599-2021
        E-mail:  gz@guntert.com
24
25  With copies sent to:
26
27
28

Cecelia C. Fusich
Vernon Law Office
2300 Geng Road, Suite 200
Palo Alto, California 94303
Tel: (650) 493-8483
Fax.: (650) 493-6160
E-mail: Cecelia.Fusich@vernonlawoffice.com

Each Party shall promptly notify all other Parties of any change in the above-listed contact information.

**28.   Force Majeure.**  No Party shall be considered to be in default in the performance of any of its obligations when a failure to perform is due to a "Force Majeure." A Force Majeure event is any circumstances beyond the Party's reasonable control, including, without limitation, any act of God, war, fire, earthquake, flood, and restraint by court order or public authority. A Force Majeure event does not include normal inclement weather, such as anything less than or equal to a 100 year/24-hour storm event, or inability to pay. Any Party seeking to rely upon this paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid, and which by exercise of due diligence has been unable to overcome, the Force Majeure.

**29.   Regulatory Approval.**  If for any reason the United States Department of Justice, the United States Environmental Protection Agency or the Court should decline to approve this Consent Agreement in the form presented, the Parties shall use their best efforts to work together to modify the Consent Agreement within thirty (30) days so that it is acceptable to the United States Department of Justice, the United States Environmental Protection Agency or the Court.

**30.   Modification and Amendment.**  This Consent Agreement may be amended or modified only by a writing signed by the Parties or their authorized representatives, and then by order of the Court.

31.    **Drafting.** This Consent Agreement shall be deemed to have been drafted equally by the Parties, and shall not be interpreted for or against any Party on the ground that any such party drafted it.

The Parties hereto enter into this Consent Agreement and respectfully submit it to the Court for its approval and entry as an Order and Final Judgment.


Dated: _____        California Sportfishing Protection Alliance


By: _____
     Bill Jennings, Executive Director


Dated: _____        Guntert & Zimmerman Const. Div. Inc. and
                                  Guntert Sales Div., Inc.


By: _____
     Ronald. M Guntert, Jr., CEO

### ORDER

Having reviewed and fully considered the parties' request to enter this Consent Agreement as an order, the Court finds this agreement to be fair, adequate and reasonable, consistent with applicable laws, and protective of the public interest.

The foregoing Consent Agreement is hereby approved and judgment is entered therewith. The Court shall retain jurisdiction over the parties with respect to disputes arising under the Consent Agreement.

IT IS SO ORDERED.

**Dated:  May 13, 2014**

_____
MORRISON C. ENGLAND, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT

**EXHIBIT A**

**Facility Map**

**EXHIBIT B**

**Notice of Violation**

**EXHIBIT C**

**Sampling Parameter Values**

| Parameter | Value |
|---|---|
| Total Suspended Solids ("TSS") | 100 mg/L |
| pH | 6.0 – 9.0 |
| Specific Conductivity ("SC") | 200 µmhos/cm |
| Oil & Grease ("O&G") | 15 mg/L |
| Iron ("Fe') | 1.0 mg/L |
| Lead ("Pb") | 0.0816 mg/L |
| Aluminum ("Al" | 0.75 mg/L |
| Zinc ("Zn" | 0.117 mg/L |
| Cadmium ("Cd") | 0.0159 mg/L |
| Chromium ("Cr") | 0.085 mg/L |
| Copper ("Cu") | 0.063 mg/L |
| Total Petroleum Hydrocarbons ("TPH")[2] | 100 mg/L |
| Benzene | 0.01 mg/L |

---

[2]Testing must be done using "Method 8015(m)" and the laboratory should report all peaks.